# EXHIBIT A

George V. Granade (State Bar No. 316050)
*ggranade@reesellp.com*
**REESE LLP**
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070

Michael R. Reese (State Bar No. 206773)
*mreese@reesellp.com*
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500

Kevin Laukaitis (*pro hac vice* to be filed)
*klaukaitis@laukaitislaw.com*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205 - #10518
San Juan, Puerto Rico 00907
Telephone: (215) 789-4462

*Counsel for Plaintiff Tinamarie Barrales
and the Proposed Class*

Electronically FILED by
Superior Court of California,
County of Los Angeles
12/18/2024 5:30 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By G. Carini, Deputy Clerk

# SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| TINAMARIE BARRALES, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>NEWELL BRANDS INC., *a Delaware corporation*,<br><br>Defendant. | Case No. 24STCV33476<br><br>**CLASS ACTION COMPLAINT**<br><br>**1. Unjust Enrichment under Georgia Law**<br>**2. Violation of California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.***<br>**3. Violation of California's False Advertising Law, CAL. BUS. & PROF. CODE § 17500 *et seq.***<br>**4. Violation of California's Consumers Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq.***<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Tinamarie Barrales ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), by and through her attorneys, brings this class action complaint against Defendant Newell Brands Inc. ("Defendant" or "Newell") and alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

**NATURE OF THE ACTION**

1.      This is a class action lawsuit regarding Defendant's manufacturing, distribution, advertising, marketing, labeling, distribution, and sale of its "Nuk" branded baby bottle Products[1] that are sold nationwide and marketed as, among other things, "BPA Free" (the "Representations"). Unfortunately for all reasonable consumers, including Plaintiff, the Representations are false and misleading.

2.      Far from being "BPA Free," the Products contain considerable amounts of harmful microplastics.

3.      Despite including harmful microplastics in its Products, Defendant goes to considerable lengths to mislead consumers into believing the Products are safe, good for them, and BPA Free. Moreover, Defendant omits that the Products contain harmful microplastics, especially when heated – a material fact to Plaintiff and all reasonable consumers – on the Products' labeling and marketing.

4.      Defendant makes the Representations and material omissions to increase profits and market share in the growing baby products market where safety is a significant consumer purchasing decision. Indeed, consumers value products free of BPA that promote safety.

5.      Consumers have become increasingly concerned about the effects of synthetic, artificial, and chemical ingredients in food, dietary supplements, cleaning products, bath and

---

[1] "Product" and "Products" refer to the following Nuk product varieties: Feeding Bottles, Storage Bottles, Feeding and Storage Bottle Sets, and Anti Colic Bottles. Plaintiff reserves the right to amend the complete list of Products subject to this lawsuit based on facts obtained in discovery. All of the Product labels contain substantially similar representations and omissions about being "BPA Free" and safe to use as intended, which Plaintiff and the Class members read and relied on before purchasing the Products.

beauty products, and everyday household products. Companies like Defendant have capitalized on consumers' desire for purportedly "natural products." Indeed, consumers are willing to pay and have paid a premium for products branded "natural" over products that contain synthetic ingredients. In 2015, sales of natural products grew 9.5% to $180 billion.[2]

6.   Reasonable consumers, including Plaintiff and the Class members, value "BPA Free" products for important reasons, including the belief that they are safer and healthier than alternative products not considered "BPA Free."

7.   Before placing the Products into the stream of commerce and into the hands of consumers to purchase and children to put in their mouths, Defendant knew or should have known that the Products contained harmful microplastics. However, Defendant misrepresented, omitted, and concealed this material fact to all reasonable consumers, including Plaintiff and the Class members, by not including this information anywhere on the Products' labeling.

8.   Plaintiff and the Class members reasonably relied on Defendant's Representations and material omissions when purchasing the Products.

9.   Plaintiff and the Class members purchased the Products and paid a price premium based on Defendant's Representations and omissions.

10.   Because Defendant's false and misleading Representations dupe reasonable consumers into believing the Products feature premium attributes (i.e., BPA-Free), Defendant's Representations thus dupe reasonable consumers into paying premium prices for the Products, even though they do not actually feature the premium attributes for which the consumers, including

---

[2] Elaine Watson, FOOD NAVIGATOR, *Natural Products Industry Sales up 9.5% to $180bn Says NBJ*, https://web.archive.org/web/20240713052206/https://www.foodnavigator-usa.com/Article/2016/03/14/EXPO-WEST-trendspotting-organics-natural-claims?page=7#news; *see also* Shoshanna Delventhal, *Study Shows Surge in Demand for "Natural" Products*, INVESTOPEDIA (Feb. 22, 2017), https://web.archive.org/web/20170909034644/http://www.investopedia.com/articles/investing/02 2217/study-shows-surge-demand-natural-products.asp (study by Kline Research indicated that in 2016, the personal care market reached 9% growth in the U.S. and 8% in the U.K.; the trend-driven natural and organic personal care industry is on track to be worth $25.1 million by 2025); *Natural living: The next frontier for growth? [NEXT Forecast 2017]*, NEW HOPE NETWORK (Dec. 19, 2016), http://www.newhope.com/beauty-and-lifestyle/natural-living-next-frontier-growth-next-forecast-2017.

1  Plaintiff and the Class members, pay.

2      11.    Defendant is, therefore, liable to Plaintiff and the Class members for selling the

3  Products without disclosing that the Products contain harmful microplastics.

4      12.    On behalf of herself and the Class, Plaintiff seeks monetary and injunctive relief.

5  <u>**PARTIES**</u>

6      13.    Plaintiff Tinamarie Barrales is a resident and citizen of Huntington Park, California,

7  in Los Angeles County. Plaintiff has purchased numerous varieties of the Products during the

8  relevant statutory period, including Nuk Simply Natural baby bottles at Food For Less and

9  Walmart in California. Most recently, Plaintiff purchased the Products at Walmart in California in

10  or around May 2024.

11      14.    Plaintiff and reasonable consumers believe that "BPA Free" products do not contain

12  harmful microplastics. Plaintiff and reasonable consumers believe "BPA Free" means that the

13  Products do not pose the danger of harmful plastics when used as intended.

14      15.    When purchasing the Products, Plaintiff read and reviewed the accompanying

15  labels and disclosures and understood them as representations by Defendant that the Products were

16  adequately manufactured and labeled and free from defects, and that the Representations were

17  true. Plaintiff read and relied on Defendant's Representations when deciding to purchase the

18  Products, and these Representations were part of the basis of the bargain. Had Defendant not made

19  the false, misleading, and deceptive Representations and omissions alleged herein regarding the

20  Products, Plaintiff would not have been willing to purchase the Products. Plaintiff paid a price

21  premium for the Products based on Defendant's Representations and material omissions.

22  Accordingly, Plaintiff was injured and lost money due to Defendant's mislabeling and deceptive

23  conduct.

24      16.    Defendant Newell is a Delaware corporation with its principal place of business

25  and headquarters in Atlanta, Georgia.

26      17.    Newell represents itself as "a leading consumer products company with a portfolio

27

28

1   of iconic brands" including Nuk.[3]

2      18.    Nuk is a popular consumer baby products brand.

3      19.    Nuk says, "The NUK® family of brands design and develop superior products that

4   enhance your child's overall development."[4]

5      20.    Under the Nuk brand, Defendant sells the Products throughout the United States,

6   including in California. The Products, including those purchased by Plaintiff and the Class

7   members, are available at various retail stores throughout the United States, including California.

8   Defendant authorized the false, misleading, and deceptive marketing, advertising, distribution, and

9   sale of the Products to consumers nationwide, including in California.

10     21.    Plaintiff reserves the right to amend this lawsuit to include any additional

11  defendants who may be subject to these allegations regarding the false advertising of the Products.

12  **JURISDICTION AND VENUE**

13  **Jurisdiction**

14     22.    This Court has personal jurisdiction over Defendant for reasons including but not

15  limited to the following: Defendant has purposefully availed itself of the privilege of doing

16  business in California. Plaintiff's claims against Defendant arise out of its contacts with California,

17  including its dissemination within California of the false and misleading Representations that the

18  Products are "BPA Free." Defendant knowingly directed its Products through the stream of

19  commerce into this forum. Defendant has advertised and marketed within this forum. Defendant

20  knowingly directs electronic activity into this forum with the intent to engage in business

21  interactions and has in fact engaged in such interactions. Defendant offers the Products to

22  consumers in this forum, who made purchases using Defendant's website in this forum and whose

23  losses were incurred here. The Court has specific personal jurisdiction over Defendant, and

24  Defendant can be said to have reasonably anticipated being hailed into court in this forum.

25  **Venue**

26     23.    Venue is proper in the County of Los Angeles, California, as the actions and harms

27

28  _____

[3] https://www.newellbrands.com/our-company/who-we-are.
[4] https://www.nuk-usa.com/about-us.html.

alleged herein occurred, in part, in the County of Los Angeles.

## COMMON FACTUAL ALLEGATIONS

### Microplastics Harm Human Health

24.    Microplastics are small plastic particles less than 5 millimeters in diameter that form when solid plastics break down through abrasion, degradation, or chemical processes such as exposure to heat.[5] These tiny particles can significantly affect human health, especially children.[6]

25.    Studies show that microplastics alter the composition of gut microbiota, which play a crucial role in digestion, nutrient absorption, and immune system development.[7] Furthermore, microplastics "produc[e] a toxic effect on the digestive tract," that causes irreversible changes in the reproductive axis and central nervous system of offspring after prenatal and neonatal exposure, affect the immune system due to their physicochemical properties, and can cause chronic pulmonary disease.[8]

26.    Due to their small size, microplastics can bioaccumulate, which results in compounding adverse health effects, such as growth and reproduction issues, DNA damage due to oxidative stress, inflammation, physical stress, weakened immunity, histological damage, or even death.[9]

27.    Digestion or oral intake is the most significant mode of microplastic transmission

---

[5] *See* Sumon Sarkar, Hanin Diab & Jonthan Thompson, *Microplastic Pollution: Chemical Characterization and Impact on Wildlife*, 20(3) INT. J. ENVIRON. RES. PUBLIC HEALTH 1745 (2023).

[6] *See* Raffaele Marfella et al., *Microplastics and Nanoplastics in Atheromas and Cardiovascular Events*, 390 NEW ENGLAND J. MED. 900-10 (Mar. 6, 2024), https://www.nejm.org/doi/full/10.1056/NEJMoa2309822 (concluding that "patients with carotid artery plaque in which [microplastics and nanoplastics (MNPs)] were detected had a higher risk of a composite of myocardial infarction, stroke, or death from any cause at 34 months of follow-up than those in whom MNPs were not detected").

[7] *See* Alba Tamargo et al., *PET Microplastics Affect Human Gut Microbiota Communities During Simulated Gastrointestinal Digestion, First Evidence of Plausible Polymer Biodegradation During Human Digestion*, 12 SCI. REPS. 528 (Jan. 11, 2022), https://doi.org/10.1038/s41598-021-04489-w ("The work presented here indicates that microplastics are indeed capable of digestive-level health effects.").

[8] Nur Hanisah Amran et al., *Exposure to Microplastics During Early Developmental Stage: Review of Current Evidence*, 10 TOXICS 597 (Oct. 10, 2022), https://doi.org/10.3390/toxics10100597.

[9] *Id.*

into the human body.[10]

**Microplastics Are Particularly Harmful to Children**

28.    The dangers of microplastic exposure are particularly severe for infants, as these early encounters with microplastics can pave the way for chronic health conditions that can manifest over a lifetime.[11] Exposure to even low doses of microplastics during a child's early development may cause long-term health complications later in life.[12] Experts in microplastics warn that infants, with their entire lives ahead of them, face a heightened risk of developing lifelong ailments due to their prolonged exposure to microplastics starting from such a young age.[13]

29.    During critical periods of development, such as infancy and early childhood, exposure to microplastics can profoundly impact various bodily systems—including the digestive, reproductive, central nervous, immune, and circulatory systems—leading to long-term health impairments.[14]

30.    This extreme harm is particularly critical in infants, who may suffer from a wide array of severe health issues because of microplastic exposure. One study found that average fecal microplastic levels were over ten times higher in infants than in adults.[15] Scientists studying microplastics and early child development have therefore emphasized that "enacting solid legislative laws and policies to manage the excessive use of plastic products is crucial; otherwise, the health of ecosystems and living organisms will inevitably deteriorate in the coming

---

[10] *Id.*

[11] *Id.*; *see also* Liping Liu et al., *Release of Microplastics from Breastmilk Storage Bags and Assessment of Intake by Infants: A Preliminary Study*, 323 ENV'T POLLUTION (Apr. 15, 2023), at 2, https://doi.org/10.1016/j.envpol.2023.121197 ("Exposure to low doses of [microplastics] during early development may cause perturbation of gas and nutrients exchange and induce long-term health effects.").

[12] Amran, *supra* note 8.

[13] Liu, *supra* note 11, at 1 ("Infancy is known to be a sensitive window for environmental exposure, which may increase susceptibility to certain diseases in adulthood.").

[14] *Id.*

[15] News Release, AM. CHEM. SOC'Y, *Infants Have More Microplastics in Their Feces Than Adults, Study Finds* (Sept. 22, 2021), https://www.acs.org/pressroom/newsreleases/2021/september/infants-have-more-microplastics-in-their-feces-than-adults-study-finds.html.

1    years. . . . We feel that the government and industries must exert the most significant effort to

2    protect children from MPs [microplastics] exposure. These procedures include avoiding plastic

3    contact of children's meals . . . ."[16]

4    　　　31.    Another study emphasized the consequences of microplastic ingestion on

5    cardiovascular systems, finding that subjects with "carotid artery plaque in which microplastics

6    were detected had a higher risk of a composite myocardial infarction, stroke, or death from any

7    cause."[17]

8    　　　32.    Despite the apparent dangers, Defendant actively conceals the known risks

9    associated with microplastic exposure, depriving parents of the ability to make informed choices

10   about their children's health and well-being. The Products' material omissions and the "BPA Free"

11   Representations work in tandem to create a false sense of security, leading parents to believe that

12   their children will be safe from the severe consequences of using the Products. In reality, parents

13   are exposing their children to "irreversible changes in the reproductive axis and central nervous

14   system," among other harms.[18]

15   **The Products Are Made of Polypropylene Plastic and Are Exposed to Heat Through**
**Ordinary Use**

16

17   　　　33.    Plaintiff and other reasonable consumers understand that the regular and ordinary

18   use of baby bottles involves holding heated liquids (such as formula or breastmilk) and possibly

19   using boiling liquids for sterilization. Defendant fails to inform consumers that the Products made

20   of polypropylene "release microplastics with values as high as 16,200,000 particles per litre," and

21   that "sterilization and exposure to high-temperature water significantly increase microplastic

22   release."[19] By advertising and selling the Products without disclosing the material risks associated

23   with heating, Defendant jeopardizes the health and well-being of countless children and misleads

24

25   ───────────────

26   [16] Amran, *supra* note 8.
[17] Marfella, *supra* note 6.
[18] Amran, *supra* note 8.

27   [19] Dunzhu Li et al., *Microplastic Release from the Degradation of Polypropylene Feeding Bottles During Infant Formula Preparation*, 1 NATURE FOOD 746, 746 (Nov. 2020),

28   https://doi.org/10.1038/s43016-020-00171-y.

parents who trust in the safety of these Products.

34.    Heating polypropylene releases 13.5% to 67.5% more microplastics into liquids at 140 degrees Fahrenheit than at 41 degrees.[20] Products with polypropylene plastic composition release microplastics through sterilization and cleaning, shaking with warm water, and other high-temperature water exposure during formula preparation procedures.[21] "Microplastics are synthetic polymer compounds that form when large plastic materials are fragmented and micronized to a size of ≤5 mm."[22] One study found that polypropylene infant feeding bottles can produce up to 16 million microplastic particles per liter.[23] The amount of microplastics released increases with exposure to high water temperatures and sterilization.[24]

35.    Current research shows that toddlers consuming microwaved dairy products from polypropylene containers can intake up to 22.1 ng/kg per day of microplastics.[25] Another study found that a single infant's microplastic consumption through polypropylene feeding bottles ranges from 14,600 to 4,550,000 particles per day.[26]

36.    Exposing plastic containers to higher temperatures leads to a more than twofold increase in the total amount of microplastics released.[27] However, it is estimated that roughly 12% of those who reheat breastmilk use the microwave. Defendant fails to warn consumers that its Products should not be heated due to extreme microplastic exposure increases.

37.    Additionally, many parents sanitize baby feeding products via exposure to heat,

---

[20] Guanyu Zhou et al., *How Many Microplastics Do We Ingest When Using Disposable Drink Cups?*, 441 J. HAZARDOUS MATERIALS (Jan. 2023), at 5, https://doi.org/10.1016/j.jhazmat.2022.129982.

[21] Li, *supra* note 19.

[22] Yongjin Lee et al., *Health Effects of Microplastic Exposures: Current Issues and Perspectives in South Korea*, 64 YONSEI MED. J. 301, 301 (May 2023), https://doi.org/10.3349/ymj.2023.0048.

[23] Li, *supra* note 19.

[24] *Id.*

[25] Kazi Albab Hussain et al., *Assessing the Release of Microplastics and Nanoplastics from Plastic Containers and Reusable Food Pouches: Implications for Human Health*, 57 ENV'T SCI. & TECH. 9782, 9782 (2023), https://pubmed.ncbi.nlm.nih.gov/37343248/.

[26] Li, *supra* note 19.

[27] *Id.*; Hussain, *supra* note 25, at 9786 ("These findings are consistent with a previous study that reported a 2 order magnitude increase in microplastics release from polypropylene infant feeding bottles into water when temperatures increased from 25 to 95 °C." (footnote omitted)).

1    such as by boiling the products.[28] One study found that over 10 million polypropylene

2    microplastics per liter are released during a single boil.[29] The CDC recommends that caretakers

3    sterilize baby feeding equipment daily.[30] Even if the Products are not heated with milk, the

4    sterilization heat still causes the Products to release copious amounts of microplastics.

5         38.     Despite these apparent risks, Defendant fails to inform consumers of the need to

6    mitigate the associated microplastic release to prevent them from entering the food and drink in

7    the Products, such as by repeated subsequent rinses with cold water.[31]

8    **The Products Are Intended to Be Heated Daily and for Constant Use by Babies and Their Caregivers**

9

10        39.     The Products are essential feeding devices that infants and young children use

11   multiple times daily.[32] It is a well-known fact that babies often have their bottles or cups in or near

12   their mouths for extended periods. This constant, repeated exposure to the Products significantly

13   amplifies the risk posed by the microplastics they leach.

14        40.     The danger of microplastics lies not just in a single exposure but in their ability to

15   bioaccumulate in the body over time. Each instance of exposure compounds the potential for long-

16   term harm. For infants and young children, who are in a critical stage of development, this

17   accumulated exposure can have devastating consequences. When parents use Defendant's

18   Products to feed their children, as intended, they unwittingly expose their vulnerable infants to a

19   daily dose of microplastics. Over the weeks, months, and years of a child's development, this

20   constant exposure can lead to a dangerous accumulation of microplastics in their young bodies,

21   putting them at risk for a host of serious health issues affecting their digestive system, immune

22

23   ---

[28] Li, *supra* note 19.

24   [29] *Id.* at 751.

[30] CENTERS FOR DISEASE CONTROL & PREVENTION, *How to Clean, Sanitize, and Store Infant*
25   *Feeding    Items    Frequently    Asked    Questions*    (Apr.    16,    2024),
     https://www.cdc.gov/hygiene/faq/?CDC_AAref_Val=https://www.cdc.gov/hygiene/childcare/cle
26   an-sanitize.html.

[31] *See* Li, *supra* note 19.
27   [32] Mary L. Gavin, *Formula Feeding FAQs: How Much and How Often*, KIDS HEALTH (Nov. 2021),
     https://kidshealth.org/en/parents/formulafeed-
28   often.html#:~:text=Newborns%20and%20young%20babies%20should,about%20every%203%E
     2%80%934%20hours.

1    function, reproductive health, and more. The cumulative nature of this risk makes Defendant's

2    misconduct all the more egregious and the need for accountability all the more urgent.

3    **Defendant's Products' Labeling Contains False and Misleading Representations**

4        41.    Defendant manufacturers, markets, sells, and distributes the Nuk branded Products,

5    which all contain "BPA Free" front-label representations that are substantially similar to the

6    representation depicted below:
















    

42.     Defendant's "BPA Free" Representations are also made consistently on Defendant's website, https://www.nuk-usa.com/, and Defendant's Products' pages on various retailers' websites. For example:





43.    Defendant's Products are manufactured, distributed, and sold throughout the United States, including in California. They are sold in-store at mass-market retailers and online at places like Amazon.com. Defendant's "BPA Free" Representations appear on the front labeling of the Products, Defendant's website, and retailers' websites.

44.    The Representations are forward-facing to the consumer. Reasonable consumers read and relied on the Representations, which are false and misleading because the Products produce harmful microplastics when heated for everyday use.

45.    Had Plaintiff and the Class members known that the Products contained harmful microplastics or risked containing harmful microplastics when used normally, Plaintiff and the Class members would not have purchased the Products or would have paid less for them.

**Defendant Also Makes Material Omissions That Mislead Reasonable Consumers About the Products' Safety and Conceals the Presence of Harmful Microplastics**

46.    Defendant materially omits that the Products pose the danger of leaching microplastics, which causes detrimental long-term harm to children. Reasonable consumers expect manufacturers to disclose dangers associated with their products. This is especially true for manufacturers of baby products as these products are intended for society's most vulnerable population, and therefore, consumers expect a heightened degree of safety for such products.

47.    Defendant fails to live up to the reasonable consumer's expectations of the Product because the Product leaches microplastics into the bottle's contents upon heating through ordinary use, contaminating the food babies and infants consume. Defendant, therefore, misleads reasonable consumers through its Representations and material omissions into believing the Products are safe and do not pose any safety risks.

**Defendant Further Misleads Consumers About the Products' Safety**

48.    Defendant fails to disclose the safety risks and represents that the Products are "BPA Free" on the front labels of its Products. "BPA" stands for Bisphenol A. BPA is a chemical used to manufacture polycarbonate plastics that leach into food and beverages. BPA causes adverse health effects on the reproductive system, child development, metabolic disorders, obesity, endocrine disorders, and the nervous system. BPA can also damage DNA, cause oxidative stress,

and promote certain breast cancers. Bottles made with BPA present a similar danger as bottles made from polypropylene, as both bottles leach harmful substances when heated and cause adverse health impacts to the human digestive, immune, and reproductive systems. Reasonable consumers interpret "BPA Free" as meaning that the products do not pose the danger of harmful plastics. In tandem with Defendant's material omissions, reasonable consumers believe that the Products are safe, i.e., do not pose the risks associated with harmful plastics.

**<u>Plaintiff and Reasonable Consumers Were Misled by Material Omissions and Representations When Buying the Products</u>**

49.    Defendant manufactures, markets, promotes, advertises, labels, packages, and sells the Products materially omitting the danger and risk from the Products' front-facing labels and packaging.

50.    Defendant conspicuously displays the "BPA Free" claim on the Products' labeling and packaging yet fails to tell consumers that the Products will leak dangerous microplastics through ordinary use.

51.    Defendant's material omissions and Representations lead reasonable consumers, like Plaintiff, into believing that the Products are safe—meaning, consumers are led to believe that the Products are a safer choice for feeding babies and young children that do not pose a risk.

52.    Defendant's omissions are material to reasonable consumers, including Plaintiff, in deciding to buy the Products because reasonable consumers value information relating to the Products' safety. This is especially true when it concerns using the Products in their intended and ordinary way, which results in harmful plastics being consumed by babies—meaning that it is important to consumers that the Products are safe and motivates them to buy them.

53.    The Class, including Plaintiff, reasonably relied on Defendant's omissions in purchasing the Products.

54.    Defendant's omissions are deceptive because the Products leach microplastics into milk and formula during ordinary use.

55.    When purchasing the Products, the Class members, including Plaintiff, were unaware and had no reason to believe that the omissions were misleading, deceptive, and unlawful.

The Products' labeling and packaging led consumers to believe that the Products were free from harmful plastic exposure. The Products did not contain a clear, unambiguous, and conspicuously displayed statement informing reasonable consumers that the Products posed the risk of containing harmful microplastics.

### Defendant's Knowledge

56.    Defendant knew that the omissions were misleading, deceptive, and unlawful at the time that Defendant manufactured, marketed, advertised, labeled, and sold the Products.

57.    Defendant knew that the omissions would lead reasonable consumers into believing that the Products would not expose their infants and young children to harmful microplastics. Not only has Defendant utilized a long-standing brand strategy to identify the Products as safe, but Defendant also has an obligation under section 5 of the Federal Trade Commission Act, codified at 15 U.S.C. § 45, to evaluate its marketing claims from the perspective of the reasonable consumer. That means Defendant was statutorily obligated to consider whether the omissions, in isolation or conjunction with its marketing strategy, would mislead reasonable consumers into believing that the Products are free from harmful microplastic exposure. Thus, Defendant knew that the omissions were misleading before it marketed the Products to the Class, including Plaintiff.

58.    Defendant knew of its omissions' materiality to consumers. First, manufacturers and marketers, like Defendant, know safety is paramount for consumers of baby and infant products. Here, the omission relates directly to the Products' safety. Second, Defendant's awareness of the importance of the Products' safety, specifically safety related to harmful plastics, is reflected by its "BPA Free" representation on the Products' front labels and packaging consistent throughout all Product packaging and labeling. Third, it is common sense that information concerning the risk of harmful microplastics and the Products' safety is material to consumers as Defendant knows that the risk of health complications from using the Products would affect whether consumers purchased them.

59.    Even worse, as the manufacturer and marketer of the Products, Defendant had exclusive control over the omissions and Representations on the Products' labels, packaging, and advertisements. Defendant could have easily disclosed the risks or rectified consumers' misplaced

beliefs by informing them about the leaching of microplastics. However, despite Defendant's knowledge of the falsity of the omissions and its awareness that consumers reasonably rely on these representations and omissions when deciding to purchase the Products, Defendant deliberately chose to market the Products with the misleading omissions. This decision led consumers to buy or overpay for the Products, believing they possessed attributes that Defendant falsely advertised. Therefore, at all relevant times, Defendant knew that the omissions would mislead reasonable consumers, such as Plaintiff, into purchasing the Products to obtain the product attributes that Defendant deceptively portrayed.

**Defendant Had a Duty to Disclose**

60.    Defendant had an obligation, at all relevant times, to disclose the material omissions—that the Products leach harmful microplastics into milk or formula during ordinary use. This crucial information, which Defendant deliberately withheld from consumers, is material to their purchasing decisions and has far-reaching consequences for the health and well-being of infants and young children. Defendant knew that reasonable consumers would perceive the Products and the absence of the material omissions to mean that the Products were free from harmful plastics. It was also known that this attribute was a key factor influencing consumers' choices, causing them to rely on the absence of material omission when deciding to purchase the Products.

61.    Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains harmful microplastics, especially at the point of sale. Discovering this information requires a scientific investigation and knowledge of chemistry beyond the average consumer's.

62.    Plaintiff and similarly situated consumers would not have purchased the Products or would not have overpaid a price premium for them if they had known that the Products posed a safety risk and, therefore, that the Products do not have the attributes claimed, promised, advertised, and/or represented. Accordingly, based on Defendant's material omissions, reasonable consumers, including Plaintiff, purchased the Products to their detriment.

**Defendant's Knowledge, Representations, Omissions, and Concealment of Material Facts Deceived Plaintiff and Reasonable Consumers – This Conduct is False and Deceptive**

63.    To drive up sales in the competitive baby products market and expand its market share, Defendant knowingly omits the material fact that the Products contain or risk containing harmful microplastics when heated up and used normally.

64.    Thus, reasonable consumers who are shopping for products free of BPA purchase Defendant's Products based on the above Representations and material omissions made by Defendant at the point of sale. But for Defendant's false and misleading labeling Representations, these customers would not have purchased Defendant's Products or would not have paid as much as they did.

65.    Additionally, a large cross-section of customers, particularly those in the "clean labeling" movements, will not consider purchasing products that contain or risk containing BPA. These customers chose to purchase Defendant's Products based on the false belief that they did not have harmful microplastics and were safe to use as intended. But for Defendant's false and misleading labeling statements, these customers would not have purchased the Products or would have paid less.

66.    Defendant, a large, sophisticated nationwide company that manufactures, distributes, and sells consumer products, including baby products, knew or should have known that the products contained harmful microplastics.

67.    Defendant sold, and continues to sell, the Products containing harmful microplastics during the relevant class period despite Defendant's knowledge of the presence of harmful microplastics when the Products are heated during normal use.

68.    Defendant has engaged in deceptive, untrue, and misleading advertising by making the labeling Representations discussed above. Defendant's conduct is also deceptive because Defendant omits the material fact that the Products contain harmful microplastics. Defendant's conduct is also unfair for all of the reasons discussed above.

69.    Plaintiff would not have purchased the Products or paid as much for them had they been truthfully and accurately labeled.

70.    Had Defendant adequately tested the Products, it would have been discovered that the Products contained harmful or risked harmful microplastics when heated during normal use, making the Products containing the false Representations illegal to distribute, market, and sell.

71.    Defendant's concealment was material and intentional because people are concerned with what is in the products they and their children use to put in their mouths. Consumers such as Plaintiff and the Class members make purchasing decisions based on the Representations made on the Products' labeling.

72.    Defendant knows that if it had not made the material omissions and Representations, then Plaintiff and the Class members would not have purchased the Products or would not have paid as much as they did.

**Injuries to Plaintiff and the Class Members and the Public at Large**

73.    When Plaintiff purchased Defendant's Products, Plaintiff did not know and had no reason to know that Defendant's Products contained harmful microplastics.

74.    Indeed, consumers cannot test or independently ascertain or verify whether a product contains harmful microplastics, especially when heated, at the point of sale. Therefore, they must trust and rely on Defendant to truthfully and honestly report what the Products contain on their packaging and labeling.

75.    Further, given Defendant's position as a nationwide leader in the consumer products and baby products industry, Plaintiff and all reasonable consumers trusted and relied on Defendant's Representations and omissions regarding the Products.

76.    However, when consumers look at the Products' packaging, there is no mention of microplastics. On the contrary, the Products say they are "BPA Free."

77.    No reasonable consumer, including Plaintiff, would have paid as much for Defendant's Products containing the Representations had they known those Products contained any amount of harmful or potentially harmful microplastics, let alone at the limits found in Defendant's Products – making such omitted facts material to them.

78.    Defendant's false, misleading, and deceptive Representations and omissions made on the labeling of the Products are likely to continue to deceive and mislead reasonable consumers

1    and the public, as they have already deceived and misled Plaintiff and the Class members.

2        79.    Plaintiff and the Class members seek statutory and punitive damages, equitable

3    relief, attorneys' fees and costs, and any further relief this Court deems just and proper.

4        **<u>Consumer Survey Results Highlight Defendant's Misleading Representations</u>**

5        80.    To assess consumer perceptions and expectations regarding baby bottles and their

6    labeling, including "BPA Free" representations, a survey was conducted with 401 participants

7    from different States, all of whom were parents of young children.



16        81.    61.6% of respondents indicated that they associate the "BPA Free" label with the

17    product being safe to use, and 55.1% believe it means no foreign chemicals or harmful substances

18    will transfer from the bottle to its contents.





82. 17.9% of respondents are willing to pay more for the trusted "Nuk" brand name, and 21.8% prioritize the important "BPA Free" label, reflecting a clear demand for quality and safety.



83.    When asked about the importance of knowing whether a baby bottle contained or risked containing microplastics, 53.9% said it was "very important," while an additional 41.4% said it was "important."





84.    62.3% stated they would not purchase a baby bottle product if they knew it risked containing microplastics.





85. An overwhelming 88.5% of respondents believed that companies should disclose the presence or risk of microplastics in their baby bottle products.





86. These results highlight that Defendant's Representations and omissions regarding microplastics are false and misleading. Consumers reasonably rely on the "BPA Free" labeling and expect such products to be safe to use and free from harmful substances, including microplastics.

87. The survey further demonstrates that the omission of microplastic risks from the labeling and marketing of the Products deprives consumers of vital and crucial information necessary for making informed purchasing decisions. Defendant's failure to disclose these risks undermines consumer trust and causes economic harm by misleading consumers into purchasing Products they would not otherwise buy or for which they would pay less.

<u>**CLASS ALLEGATIONS**</u>

88. Plaintiff brings this class action pursuant to California Code of Civil Procedure section 382 and California Civil Code section 1781. Plaintiff seeks to represent a nationwide class defined as follows:

> ***The Nationwide Class.*** All persons who purchased the Products in the United States for personal or household use during the fullest period provided by law.

1    Plaintiff also seeks to represent a subclass defined as follows:

2        *The California Subclass.* All persons who purchased the Products in California for
         personal or household use during the fullest period provided by law.
3

4    Together, the Nationwide Class and the California Subclass are the "Class."

5        89.    Excluded from the Nationwide Class and the California Subclass are: (1) any Judge

6    presiding over this action and any members of their families; (2) Defendant, Defendant's

7    subsidiaries, parents, successors, and predecessors, and any entities in which Defendant or its

8    parents have a controlling interest, and their current or former employees, officers, and directors;

9    (3) individuals who allege personal bodily injury resulting from the use of the Products; and

10   (4) resellers of the Products.

11       90.    Plaintiff reserves the right to modify, change, or expand the Class definition as she

12   deems necessary at any time to the full extent that applicable law allows.

13       91.    Certification of Plaintiff's claims for class-wide treatment is appropriate because

14   Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as

15   individual Class members would use to prove those elements in individual actions alleging the

16   same claims.

17       92.    <u>Ascertainability</u>: The ascertainability requirement is met because the Class is

18   defined in terms of objective characteristics and common transactional facts that make the ultimate

19   identification of Class members possible when that identification becomes necessary. The Class

20   definition is sufficient to allow a member of the Class to identify himself or herself as having a

21   right to recover based on the Class description.

22       93.    <u>Numerosity</u>: The size of the Class is so large that joinder of all Class members is

23   impracticable. Due to the nature of Defendant's business, Plaintiff believes there are thousands of

24   Class members geographically dispersed throughout California and the United States.

25       94.    <u>Well-Defined Community of Interest</u>: As further alleged below, there is a well-

26   defined community of interest with respect to the Class, since there are (1) predominant common

27   questions of law or fact; (2) a Class representative with claims or defenses typical of the Class;

28   and (3) a Class representative who can adequately represent the Class.

95.   <u>Existence and Predominance of Common Questions of Law and Fact</u>: There are questions of law and fact common to the Class. These questions predominate over any questions affecting only individual Class members.

96.   All Class members were exposed to Defendant's deceptive and misleading "BPA Free" Representations and material omissions.

97.   Additional common legal and factual questions include but are not limited to:

    i.    whether the Products contain microplastics;

    ii.    whether a reasonable consumer would consider the presence of harmful microplastics in the Products (and omission of the disclosure thereof from Defendant's statements on the Product labeling) to be material;

    iii.    whether Defendant knew or should have known the Products contain harmful microplastics;

    iv.    whether Defendant's representations and/or omissions are false or misleading;

    v.    whether Defendant failed to disclose that the Products contain harmful microplastics;

    vi.    whether Defendant concealed that the Products contain microplastics;

    vii.    whether Defendant engaged in unfair or deceptive trade practices;

    viii.    whether Defendant was unjustly enriched by its conduct at issue;

    ix.    whether Defendant violated the state consumer protection statutes alleged below;

    x.    whether Plaintiff and the Class members are entitled to actual or other forms of damages and other monetary relief; and

    xi.    whether Plaintiff and the Class members are entitled to equitable relief, including but not limited to injunctive relief and equitable restitution.

98.   Defendant engaged in a common course of conduct in contravention of the laws Plaintiff seeks to enforce individually and on behalf of the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison in both quality and quantity to the numerous common questions that dominate this action. Moreover, the common questions will yield common answers.

99.   <u>Typicality</u>: Plaintiff's claims are typical of the Class because Defendant injured all

Class members through the uniform misconduct described herein; all Class members were subject to Defendant's false, misleading, and unfair advertising and marketing practices and representations, including the false and misleading "BPA Free" Representations and material omissions; and Plaintiff seeks the same relief as the Class members.

100.    There are no defenses available to Defendant that are unique to Plaintiff.

101.    <u>Adequacy of Representation</u>: Plaintiff is a fair and adequate representative of the Class because Plaintiff's interests do not conflict with those of the Class members. Plaintiff will prosecute this action vigorously and is highly motivated to seek redress against Defendant. Further, Plaintiff has selected competent counsel who are experienced in class action and other complex litigation. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so.

102.    <u>Superiority</u>: The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy for reasons including but not limited to the following:

i.    The damages individual Class members suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct.

ii.   It would be virtually impossible for the individual Class members to redress the wrongs done to them effectively. Even if the Class members could afford such individual litigation, the court system could not. Individualized litigation would unnecessarily increase the delay and expense to all parties and to the court system and presents a potential for inconsistent or contradictory rulings and judgments. By contrast, the class action device presents far fewer management difficulties, allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

iii.  The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant.

iv.   The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications or that would substantively impair or impede their ability to protect their interests.

28

103.    Injunctive and Declaratory Relief: Defendant has acted on grounds applicable to the Classes as a whole so that final injunctive and declaratory relief concerning the Class as a whole are appropriate.

104.    Notice: Plaintiff and her counsel anticipate that notice to the proposed Class will be effectuated through recognized, Court-approved notice dissemination methods, which may include United States mail, electronic mail, Internet postings, and/or published notice.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Unjust Enrichment under Georgia Law

### By Plaintiff on Behalf of the Nationwide Class and/or the California Subclass

105.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

106.    Plaintiff brings this cause of action for unjust enrichment under Georgia law on behalf of the Nationwide Class and/or the California Subclass.

107.    Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, labeling, marketing, distributing, and selling the Products while misrepresenting and omitting material facts, including by making the labeling Representations alleged herein.

108.    Defendant's unlawful conduct allowed Defendant to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiff and the Class members and to Defendant's benefit and enrichment. Defendant has violated fundamental principles of justice, equity, and good conscience.

109.    Plaintiff and the Class members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

110.    Defendant knowingly received and enjoyed the benefits conferred by Plaintiff and the Class members.

111.    It is inequitable for Defendant to retain the benefits conferred by Plaintiff and the Class members' overpayments.

112.    Plaintiff and the Class members seek to establish a constructive trust from which Plaintiff and the Class members may seek restitution.

### SECOND CAUSE OF ACTION

**Violation of California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.***

**By Plaintiff on Behalf of the California Subclass**

113.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

114.    Plaintiff brings this cause of action for violation of California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.* ("UCL"), on behalf of the California Subclass.

115.    The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." CAL. BUS. & PROF. CODE § 17200.

116.    Defendant's conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL.

117.    All of the conduct alleged herein occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern, practice, and/or generalized course of conduct, which will continue daily until Defendant voluntarily alters its conduct or is otherwise ordered to do so.

118.    Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from labeling the Products with the Representations and material omissions. Defendant failed to avail itself of reasonably available, lawful alternatives to further its legitimate business interests.

119.    *"Fraudulent" Prong*: Conduct is fraudulent under the UCL if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

120.    Defendant, in its advertising and packaging of the Products, made misleading Representations and fraudulent material omissions regarding the quality and characteristics of the Products, even though the Products are not safe because they leach microplastics when used as intended. Such Representations and omissions appear on the label and packaging of the Products,

which are sold at retail stores and point-of-purchase displays, as well as Defendant's official website and other retailers' advertisements that have adopted Defendant's advertisements.

121.    Defendant has no reasonable basis for the Representations and omissions about the Products made in Defendant's advertising and on Defendant's packaging or labeling because the Products are unsafe for infants and young children. Defendant knew and knows that the Products are not free from plastic exposure because they leach microplastics into the milk or formula during ordinary use. However, Defendant intentionally advertised and marketed the Products to deceive reasonable consumers into believing that the Products are safe.

122.    Defendant's labeling and advertising of the Products led to, and continue to lead to, reasonable consumers, including Plaintiff, believing that the Products are a safe feeding solution for their children.

123.    Defendant used the Representations and material omissions with the intent to sell the Products to consumers, including Plaintiff and the California Subclass. The Representations and material omissions are deceptive, and Defendant knew, or should have known, of their deception. The Representations and omissions are likely to mislead consumers into purchasing the Products because they are material to the average, ordinary, and reasonable consumer.

124.    Plaintiff and the California Subclass reasonably and detrimentally relied on the Representations and the material omissions in purchasing the Products.

125.    Plaintiff and the California Subclass paid for Products that were safe from plastic exposure, when, in fact, the Products leach harmful microplastics into the milk or formula. Plaintiff and the California Subclass would not have purchased the Products if they had known the truth.

126.    Plaintiff and the California Subclass have suffered injury in fact and have lost money or property as a result of and in reliance upon the Representations and material omissions— namely, Plaintiff and the California Subclass lost the purchase price for the Products they bought from Defendant, or alternatively the price premium they paid on account of the Representations and omissions.

127.    Defendant's use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner

constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of California Business and Professions Code sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of California Business and Professions Code section 17200.

128.    Pursuant to California Business and Professions Code sections 17203 and 17535, Plaintiff and the members of the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling and advertising the sale and use of the Products. Likewise, Plaintiff and the members of the California Subclass seek an order requiring Defendant to disclose such misrepresentations and to preclude Defendant's failure to disclose the existence and significance of said misrepresentations.

129.    As a direct and proximate result of Defendant's misconduct in violation of the UCL, Plaintiff and the members of the California Subclass were harmed in the amount of the purchase price they paid for the Products, or alternatively in the amount of the price premium they paid on account of the Representations and material omissions at issue.

130.    Accordingly, Plaintiff seeks a monetary award for violation of the UCL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

131.    *"Unfair" Prong*: Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

132.    Defendant's action of mislabeling the Products with the deceptive Representations and material omissions does not confer any benefit to consumers; rather, doing so causes injuries to consumers, who do not receive products commensurate with their reasonable expectations, overpay for the Products, receive Products of lesser standards than what they reasonably expected to receive, and are exposed to increased health risks. Consumers cannot avoid any injuries caused by Defendant's deceptive labeling and advertising of the Products. Accordingly, the injuries

1    caused by Defendant's deceptive labeling and advertising outweigh any benefits.

2        133.    Some courts conduct a balancing test to decide if a challenged activity amounts to

3    unfair conduct under California Business and Professions Code section 17200. They "weigh the

4    utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v.*

5    *HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

6        134.    Here, Defendant's conduct of labeling the Products with the Representations and

7    material omissions when the Products leach microplastics into milk or formula during ordinary

8    use has no utility and financially harms purchasers. Thus, the utility of Defendant's conduct is

9    vastly outweighed by the gravity of the harm.

10        135.    Some courts require that "unfairness must be tethered to some legislative declared

11    policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless*

12    *Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

13        136.    Defendant's labeling and advertising of the Products, as alleged herein, is

14    deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendant knew or

15    should have known of its unfair conduct. Defendant's deceptive Representations and material

16    omissions constitute an unfair business practice within the meaning of California Business and

17    Professions Code section 17200.

18        137.    Pursuant to California Business and Professions Code section 17203, Plaintiff and

19    the California Subclass seek an order of this Court enjoining Defendant from continuing to engage,

20    use, or employ its practices of labeling the Products with the Representations and material

21    omissions.

22        138.    Plaintiff and the California Subclass have suffered injury in fact, have lost money

23    and were exposed to increased health risks as a result of Defendant's unfair conduct. Plaintiff and

24    the California Subclass paid an unwarranted premium for the Products on account of Defendant's

25    unfair practices.

26        139.    Specifically, Plaintiff and the California Subclass paid for Products that are free

27    from harmful plastic exposure. Plaintiff and the California Subclass would not have purchased the

28    Products, or would have paid substantially less for the Products, if they had known that the

1 Products' advertising and labeling were unfair.

2  140. Accordingly, Plaintiff seeks damages, restitution and/or disgorgement of ill-gotten

3 gains pursuant to the UCL.

4  141. *"Unlawful" Prong*: The UCL identifies violations of other laws as "unlawful

5 practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC*

6 *Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

7  142. Defendant's packaging, labeling, and advertising of the Products, as alleged herein,

8 are deceptive, misleading, and unreasonable, and constitute unlawful conduct. Defendant has

9 violated at least the following laws:

10   i. Defendant's labeling of the Products, as alleged herein, violates California's

11    Consumers Legal Remedies Act and California's False Advertising Law, as

12    set forth below in the sections regarding those causes of action.

13   ii. Additionally, Defendant's use of the deceptive Representations and

14    material omissions to sell the Products violates California Civil Code

15    sections 1572 (actual fraud), 1573 (constructive fraud), 1709-1710

16    (fraudulent deceit), and 1711 (deceit upon the public).

17  143. Defendant knew or should have known of its unlawful conduct.

18  144. Pursuant to Business and Professions Code Section 17203, Plaintiff and the

19 California Subclass seek an order of this Court enjoining Defendant from continuing to engage,

20 use, or employ its practice of deceptive advertising of the Products.

21  145. Plaintiff and the California Subclass have suffered injury in fact and have lost

22 money as a result of Defendant's unlawful conduct. Plaintiff and the California Subclass paid an

23 unwarranted premium for the Products on account of Defendant's unlawful practices. Plaintiff and

24 the California Subclass would not have purchased the Products, or would have paid less for the

25 Products, if they had known of Defendant's unlawful conduct.

26  146. Accordingly, Plaintiff seeks damages, restitution and/or disgorgement of ill-gotten

27 gains pursuant to the UCL.

28

### THIRD CAUSE OF ACTION

**Violation of California's False Advertising Law, CAL. BUS. & PROF. CODE § 17500 *et seq.***

**By Plaintiff on Behalf of the California Subclass**

147.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

148.    Plaintiff brings this cause of action for violation of California's False Advertising Law, CAL. BUS. & PROF. CODE § 17500 *et seq.* ("FAL"), on behalf of the California Subclass.

149.    The FAL prohibits "unfair, deceptive, untrue or misleading advertising."

150.    Defendant violated section 17500 when it advertised and marketed the Products through the unfair, deceptive, and misleading Representations and omissions disseminated to the public through the Products' labeling, packaging, and advertising. The Representations and material omissions were deceptive because the Products do not conform to them. The Representations and material omissions were material because they are likely to and did mislead reasonable consumers into purchasing the Products.

151.    In making and disseminating the Representations and material omissions alleged herein, Defendant knew or should have known that the Representations and material omissions were untrue or misleading, and acted in violation of section 17500.

152.    Defendant's Representations and material omissions were specifically designed to induce reasonable consumers, like Plaintiff and the California Subclass, to purchase the Products.

153.    As a direct and proximate result of Defendant's misconduct in violation of the FAL, Plaintiff and the members of the California Subclass were harmed in the amount of the purchase price they paid for the Products, or alternatively in the amount of the price premium they paid on account of the deceptive Representations and omissions at issue.

154.    Accordingly, Plaintiff seeks a monetary award for violation of the FAL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies.

**FOURTH CAUSE OF ACTION**

**Violation of California's Consumers Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq.***

**By Plaintiff on Behalf of the California Subclass**

155.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156.    Plaintiff brings this cause of action for violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA"), on behalf of the California Subclass.

157.    The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

158.    The Products are "goods," as defined by the CLRA in California Civil Code section 1761(a).

159.    Defendant is a "person," as defined by the CLRA in California Civil Code section 1761(c).

160.    Plaintiff and the members of the California Subclass are "consumers," as defined by the CLRA in California Civil Code section 1761(d).

161.    The purchase of the Products by Plaintiff and the members of the California Subclass are "transactions" as defined by the CLRA under California Civil Code section 1761(e).

162.    Defendant violated the following sections of the CLRA by selling the Products to Plaintiff and the California Subclass through the misleading, deceptive, and fraudulent material omissions:

    i.      section 1770(a)(5), by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [they] do not have";

    ii.     section 1770(a)(7), by representing that the Products "are of a particular standard, quality, or grade . . . [when] they are of another"; and

    iii.    section 1770(a)(9), by advertising the Products "with intent not to sell them as advertised."

163.    Defendant's uniform and material Representations and omissions regarding the

safety risks and danger of the Products were likely to deceive reasonable consumers, and Defendant knew or should have known that its omissions and misrepresentations were misleading.

164.    Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers, including Plaintiff and the California Subclass, to increase the sale of the Products.

165.    Plaintiff and the members of the California Subclass could not have reasonably avoided such injury. Plaintiff and the members of the California Subclass were misled and unaware of the existence of facts that Defendant suppressed and failed to disclose, and Plaintiff and the members of the California Subclass would not have purchased the Products and/or would have purchased them on different terms (including at a lower price) had they known the truth.

166.    Plaintiff and the California Subclass suffered harm as a result of Defendant's violations of the CLRA because they relied on Defendant's Representations and material omissions when deciding to purchase the Products. The Representations and omissions were material because a reasonable consumer would consider them important in deciding whether to purchase the Products.

167.    Pursuant to California Civil Code section 1782, on July 15, 2024, Plaintiff's counsel delivered via U.S. Certified Mail a letter to Defendant, tracking number 9214 8901 6089 5006 2201 46, notifying it of the alleged violations of the CLRA set forth herein and demanding that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act.

168.    Defendant filed to rectify or agree to rectify the problems associated with the actions detailed herein and give notice to all affected consumers within 30 days of the date of written notice pursuant to section 1782 of the CLRA. Accordingly, Plaintiff seeks, on behalf of the California Subclass, actual, punitive, and statutory damages, as appropriate. Plaintiff also seek, on behalf of the California Subclass, restitution, disgorgement, and attorneys' fees and costs.

169.    Plaintiff has no adequate remedy at law. Without equitable relief, Defendant's unfair and deceptive practices will continue to harm Plaintiff and the California Subclass. Accordingly, Plaintiff seeks an injunction to enjoin Defendant from continuing to employ the

1   unlawful methods, acts, and practices alleged herein pursuant to section 1780(a)(2), and otherwise

2   require Defendant to take corrective action necessary to dispel the public misperception

3   engendered, fostered, and facilitated through Defendant's deceptive labeling of the Products with

4   the Representations and material omissions.

5        170.  Pursuant to California Civil Code section 1780(d), attached as **Exhibit 1** hereto is

6   an affidavit showing that this action was commenced in a proper forum.

7   **PRAYER FOR RELIEF**

8        WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for an

9   order:

10       A.  certifying the proposed Class under section 382 of the California Code of Civil

11  Procedure and section 1781 of the California Civil Code, as set forth above;

12       B.  declaring Defendant financially responsible for notifying the Class members of the

13  pendency of this suit;

14       C.  declaring that Defendant has committed the violations of law alleged herein;

15       D.  enjoining Defendant from continuing the unlawful practices set forth above;

16       E.  requiring Defendant to disgorge and make restitution of all monies Defendant

17  acquired by means of the unlawful practices set forth above;

18       F.  awarding monetary damages according to proof and in accordance with applicable

19  law, including any compensatory, incidental, or consequential damages;

20       G.  awarding punitive damages according to proof and in an amount consistent with

21  applicable precedent;

22       H.  awarding reasonable attorneys' fees and costs of suit;

23       I.  awarding pre- and post-judgment interest to the extent the law allows; and

24       J.  providing for such other relief as the Court deems just and proper.

25  **DEMAND FOR JURY TRIAL**

26  Plaintiff hereby demands trial by jury on all claims so triable.

27

28

CLASS ACTION COMPLAINT

Date: December 18, 2024

Respectfully submitted,

**REESE LLP**

By: *George Granade*

George V. Granade (State Bar No. 316050)
*ggranade@reesellp.com*
**REESE LLP**
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070

Michael R. Reese (State Bar No. 206773)
*mreese@reesellp.com*
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500

Kevin Laukaitis (*pro hac vice* to be filed)
*klaukaitis@laukaitislaw.com*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205 - #10518
San Juan, Puerto Rico 00907
Telephone: (215) 789-4462

*Counsel for Plaintiff Tinamarie Barrales and the Proposed Class*

EXHIBIT 1

George V. Granade (State Bar No. 316050)
*ggranade@reesellp.com*
**REESE LLP**
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070

Michael R. Reese (State Bar No. 206773)
*mreese@reesellp.com*
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500

Kevin Laukaitis (*pro hac vice* to be filed)
*klaukaitis@laukaitislaw.com*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205 - #10518
San Juan, Puerto Rico 00907
Telephone: (215) 789-4462

*Counsel for Plaintiff Tinamarie Barrales
and the Proposed Class*

# SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| TINAMARIE BARRALES, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>NEWELL BRANDS INC., *a Delaware corporation*,<br><br>Defendant. | Case No. _____<br><br>**AFFIDAVIT OF GEORGE V. GRANADE PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1780(d)**<br><br>**JURY TRIAL DEMANDED** |

1    Pursuant to California Code of Civil Procedure 2015.5, I, George V. Granade, declare as

2    follows:

3    1.    I am licensed to practice law in the States of California, New York, and Georgia. I

4    am an attorney at the law firm of Reese LLP, one of the counsel of record for plaintiff and the

5    proposed class in the above-captioned action.

6    2.    Defendant Newell Brands Inc. has done, and is doing, business in California,

7    including in the County of Los Angeles. Such business includes the marketing, promotion, and

8    sale of "Nuk" baby bottle products at issue.

9

10    I declare under penalty of perjury under the laws of the State of California that the

11    foregoing is true and correct. Executed on December 18, 2024, at Williamson, Georgia.

12

13    _____

14    George V. Granade

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF GEORGE V. GRANADE PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1780(d)